UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |
|---|---|
| WINVIAN FARM, LLC, individually and on behalf of all others similarly situated, | ) ) ) ) |
|  | ) Civil Action No. 3:21cv00169 |
| Plaintiff, | ) ) |
| v. | ) **JURY TRIAL DEMANDED** ) |
| LEXINGTON INSURANCE COMPANY, ACE AMERICAN INSURANCE COMPANY, IRONSHORE SPECIALTY INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY, ALLIED WORLD ASSURANCE COMPANY LTD, ARGO RE LTD, STARR SURPLUS LINES INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NUMBERS PG2002147, PG2002992, PG2002216, PG2002189, PG2002190, PG2002231, PG2002219, PG2002957, PG2002119, PG2002995, PG2002229, and 2970, HAMILTON RE, LTD., NATIONAL INDEMNITY COMPANY, AXIS SURPLUS LINES INSURANCE COMPANY, COLUMBIA CASUALTY COMPANY, HDI GLOBAL INSURANCE COMPANY, SCOR UK COMPANY LIMITED, GREAT LAKES INSURANCE SE, CHUBB BERMUDA INSURANCE LTD., HOUSTON CASUALTY COMPANY, MARKEL BERMUDA LIMITED, EVANSTON INSURANCE COMPANY, PARTNERRE IRELAND INSURANCE LIMITED, and FIDELIS UNDERWRITING LIMITED, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Winvian Farm, LLC ("Winvian Farm," "Winvian," or the "resort"), individually and on behalf of the other members of the below-defined Class (collectively, the "Class"), bring this limited fund class action against Defendants,[1] and in support thereof state the following:

### I.     NATURE OF THE ACTION

1.      Winvian Farm is a luxury resort located in the Litchfield Hills of Connecticut. Winvian includes a 1775 manor, including the 960 square foot Hadley Suite, and 18 individually-designed resort cottages. In addition to lodging, Winvian offers guests many amenities including: an outdoor pool and pool house; spa with fitness and yoga classes; gym; and restaurant, tavern, and bar. Winvian also offers indoor wedding and reception venues, and meeting, retreat, and event spaces—all with banquet service. Nearby attractions include a nature museum, and tours and tastings at wine cellars, distilleries, and breweries, as well as the dining, shopping, cinema, library, and historic sites in Litchfield.

2.      Winvian is a member of Relais & Châteaux, an association of more than 560 independent, landmark hotels and restaurants in 67 countries. Guests can book experiences at Winvian through the Relais & Châteaux system.

3.      Winvian is a member of Resort Hotel Association, Inc. ("RHA"), located in Richmond, Virginia. RHA operates as an "insurance community" for independent hoteliers in the United States and Mexico. Defendants issued commercial property insurance to RHA for March 8, 2020, to March 8, 2021, which provides that RHA and its members are each an "Insured." Total Insurable Values for all Insureds under the Policy exceed $7.5 billion.

---

[1] "Defendants" are: Lexington Insurance Company, ACE American Insurance Company, Ironshore Specialty Insurance Company, Zurich American Insurance Company, Allied World Assurance Company Ltd, Argo Re Ltd, Starr Surplus Lines Insurance Company, Certain Underwriters at Lloyd's, London Subscribing to Policy Numbers PG2002147, PG2002992, PG2002216, PG2002189, PG2002190, PG2002231, PG2002219, PG2002957, PG2002119, PG2002995, PG2002229, and 2970, Hamilton Re, Ltd., National Indemnity Company, Axis Surplus Lines Insurance Company, Columbia Casualty Company, HDI Global Insurance Company, SCOR UK Company Limited, Great Lakes Insurance SE, Chubb Bermuda Insurance Ltd., Houston Casualty Company, Markel Bermuda Limited, Evanston Insurance Company, PartnerRe Ireland Insurance Limited, and Fidelis Underwriting Limited.

4.      Winvian has been cherished by the same family for more than 70 years, first as a homestead and now as the Winvian Farm resort. The resort's existence, however, is threatened by COVID-19.[2]

5.      Due to COVID-19, Winvian has suffered "direct physical loss or damage"—under the plain and ordinary meaning of that term—because COVID-19 made the resort unusable in a way that it had been used before COVID-19.

6.      Once able to freely welcome visitors from all over the world and provide a luxurious resort and dining experience to its guests, Winvian has drastically reduced its business operations, made several structural alterations, changes and/or repairs to its property, strictly limited the number of lodging, dining, and spa guests, and closed or restricted access to numerous other amenities. To do anything else would lead to the emergence or reemergence of COVID-19 at the hotel. Until COVID-19 was brought even slightly under control, even such limited use as this was not possible.

7.      This loss is direct.[3] Plaintiff is not asking Defendants to reimburse Winvian, for example, after someone obtained a judgment against Winvian for getting them sick. That might be an indirect loss. Plaintiff is asking Defendant to pay for its loss of business income occasioned directly by being unable to use its property. Further, COVID-19 was not only a substantial factor in causing the loss, it also was the predominant or immediate factor in causing the loss or damage: COVID-19 was close in proximity to the loss or damage, such that any ordinary person would think that the loss or damage was in the zone of danger of COVID-19.

---

[2] The terms for the virus ("SARS-CoV-2," "Coronavirus," and the "virus"), and the term for the disease that it causes ("COVID-19") are used interchangeably herein, and should be read in context for particular reference to the virus, the disease, or both. For simplicity, COVID-19 is used as the predominant term.

[3] "Direct," as an adjective, is often defined as something "characterized by close logical, causal or consequential relationship" or something "marked by absence of an intervening agency, instrumentality, or influence" or something "proceeding from one point to another in time or space without deviation or interruption." https://www.merriam-webster.com/dictionary/direct

8.      This loss is physical.[4] COVID-19 structurally altered the surfaces of Covered Property and ambient air within covered properties. Winvian is unable to use its interior spaces in the manner in which it had previously used those spaces. The probability of illness prevents the use of the space in no less of a way than, on a rainy day, a crumbling and open roof from the aftermath of a tornado would make the interior space of a business unusable.[5]

9.      Civil authority closure orders in Connecticut ("Closure Orders") imposed a physical limit on Covered Property, *e.g.*, by limiting lodging, pool house, spa, fitness, restaurant, tavern, bar, indoor wedding and reception, meeting, retreat, and event operations from using 100% of their physical space, even when they weren't totally shutdown. "It is not as if the shut-down orders imposed a financial limit on the restaurants by, for example, capping the dollar-amount of daily sales that each restaurant could make."[6] Winvian has been unable to fully use its physical spaces. The Policies define "Covered Property" to include real and personal property, including fixtures and installations. Thus, a physical loss of property necessarily includes the lost physical space that Winvian can no longer fully utilize due to COVID-19 and the Closure Orders—even though some tables and chairs, equipment, etc. remain physically intact. "Another way to understand the physical nature of the loss inflicted by the shut-down orders is to consider how a restaurant might mitigate against the suspension of operations caused by, say, a 25%-capacity limitation on the number of guests inside the restaurant. If the restaurant could expand its physical space, then the restaurant could serve more guests and the loss would be mitigated (at least in part). The loss is physical—or at the very least, a reasonable jury can make that finding."[7]

---

[4] Relevant definitions of "physical" make clear that the term describes something "having material existence" or something "perceptible especially through the senses." https://www.merriam-webster.com/dictionary/physical

[5] Note, however, that Plaintiff is not seeking recovery for its loss of use. Plaintiff is seeking coverage for its loss of business income. Winvian's business has decreased because of the impairment of its resort, and Winvian is seeking the loss of business income under the business interruption coverages of the Policy.

[6] *In re: Society Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, No. 20 C 02005, 2021 WL 679109, at *9 (N.D. Ill. Feb. 22, 2021).

[7] *Id.*

10.     This loss is a loss.[8] It is the loss of functionality of the space for business purposes. It is the diminishment of the physical spaces in the buildings at the resort. What once could hold many now can safely hold only a few. It is injury and structural change to ambient air within Covered Property and the surfaces of Covered Property.

11.     The impairment of the business function is also damage to the resort.[9]

12.     For the period March 8, 2020 to March 8, 2021, Defendants issued commercial property insurance to RHA and its members, including Plaintiff. The insurance is comprised of a series of policies issued by Defendants to RHA and its members. Defendant Lexington Insurance Company is the "lead insurer." Herein, Plaintiff cites to Lexington Insurance Company Policy No. 011144535 (attached hereto as Exhibit 1) as the "Policy," and intends those citations to apply to all policies unless otherwise stated.

13.     The Policy insures "Resort Hotel Association, Inc. and its members," and others specifically endorsed on a "Named Insured Endorsement." Winvian is a member of RHA, and Winvian is identified on Named Insured Endorsement W05001.

14.     The Territory of the Policy is worldwide, except for certain countries in which RHA does not have members.

15.     The Policy "insures against all risks of direct physical loss of or damage to Covered Property during the period of insurance …, except as excluded."

16.     Covered Property includes "the interest of the Insured in all real and personal property owned, used, leased or intended for use by the Insured or in which the Insured may have an insurable interest," and also includes the "personal property of the Insured's officials and employees while on the Covered Property of the Insured," and the personal property of guests,

---

[8] Definitions of "loss" include not only "destruction" and "ruin," but also "deprivation," and synonyms for "loss" include "deprivation," "dispossession," and "impairment."
https://www.merriam-webster.com/dictionary/loss and https://www.thesaurus.com/browse/loss?s=t

[9] Damage is often defined simply as "loss or harm resulting from injury," but it is also defined as expense and cost. Synonyms for "damage" include "impairment," "deprivation," and "detriment."
https://www.merriam-webster.com/dictionary/damage and
https://www.thesaurus.com/browse/damage?s=t

other patrons, and customers while on Covered Property. Coverage is also "automatically extended to cover additional property and interests . . . which may be acquired or otherwise become at the risk of the Insured."

17.     Losses "shall be adjusted with and payable to the Insured," or as directed by the RHA.

18.     Under the Policy, "Occurrence" means: "Loss or a series of losses or several losses that are attributable directly or indirectly to one cause or disaster, or to one series of similar causes or disasters, arising from a single event. All such losses shall be combined, and the total amount of such losses shall be treated as one Occurrence irrespective of the period of time or area over which such losses occur."

19.     Plaintiff required "all risk" property coverage to protect itself in the event that Winvian Farm suddenly had to interrupt operations for reasons outside of its control, or if the resort had to act in order to prevent further property damage. Plaintiff obtained this coverage as an Insured under the Policy, which includes coverage, as described below, for Business Interruption, Extra Expense, Rental Income, Attraction Properties, Civil Authority, Guest Relocation Expenses, Protection and Preservation of Property, and Expense to Reduce Loss.

20.     Unlike many policies that provide Business Interruption and Contingent Business Interruption coverage, the Policy does not include, and is not subject to, the industry standard "Exclusion of Loss Due to Virus or Bacteria."

21.     Winvian was forced to interrupt business and suffered physical loss of or damage to property due to COVID-19 and resultant Closure Orders issued by civil authorities in Connecticut, as well as in order to protect and preserve property from actual or imminent physical loss or damage, and to reduce losses under the Policy.

22.     Upon information and belief, Defendants have, on a widescale and uniform basis, refused to pay their policyholders under Business Interruption and Contingent Business Interruption coverages for losses suffered due to COVID-19, any resultant executive orders by civil authorities that have required the necessary interruption of business, and any efforts to prevent

further property damage or to minimize the interruption of business and continue operations. Indeed, Defendants have denied coverage in this case.

## II.     JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Defendant and at least one member of the Class are citizens of different states and because: (a) the Class consists of at least 100 members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) no relevant exceptions apply to this claim.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred within the District.

## III.     THE PARTIES

*Plaintiff*

25.     Plaintiff Winvian Farm, LLC is organized under the laws of Connecticut, with its principal place of business in Morris, Connecticut. The citizenship of the member(s) of Winvian Farm, LLC is Connecticut.

*Defendants*

26.     Defendant Lexington Insurance Company ("Lexington") is an insurance company organized under the laws of the State of Delaware, with its principal place of business in Boston, Massachusetts. For the period March 8, 2020 to March 8, 2021, Lexington issued to RHA and its members Policy Nos. 011144535 and 011144540.

27.     Defendant ACE American Insurance Company ("ACE") is organized under the laws of Pennsylvania, with its principal place of business in Philadelphia, Pennsylvania. For the period March 8, 2020 to March 8, 2021, ACE issued to RHA and its members Policy Nos. GPA D42219174 003 and PEX D42219368 003.

28.     Defendant Ironshore Specialty Insurance Company ("Ironshore") is organized under the laws of Arizona, with its principal place of business in Boston, Massachusetts. For the period March 8, 2020 to March 8, 2021, Ironshore issued to RHA and its members Policy Nos. 1000383838-01 and 1000383215-01.

7

29.     Defendant Zurich American Insurance Company ("Zurich") is organized under the laws of New York, with its principal place of business in Schaumburg, Illinois. For the period March 8, 2020 to March 8, 2021, Zurich issued to RHA and its members Policy No. PPR 7140748-01.

30.     Defendant Allied World Assurance Company Ltd ("AWAC") is organized under the laws of Bermuda, with its principal place of business in Bermuda. For the period March 8, 2020 to March 8, 2021, AWAC issued to RHA and its members Policy No. PG2012221.

31.     Defendant Argo Re Ltd ("Argo Re") is organized under the laws of Bermuda, with its principal place of business in Bermuda. For the period March 8, 2020 to March 8, 2021, Argo Re issued to RHA and its members Policy Nos. PG2002220 and PG2002195.

32.     Defendant Starr Surplus Lines Insurance Company ("Starr") is organized under the laws of Texas, with its principal place of business in New York, New York. For the period March 8, 2020 to March 8, 2021, Starr issued to RHA and its members Policy No. SLSTPTY11276920.

33.     Defendants Certain Underwriters at Lloyd's, London Subscribing to Policy Numbers PG2002147, PG2002992, PG2002216, PG2002189, PG2002190, PG2002231, PG2002219, PG2002957, PG2002119, PG2002995, PG2002229, and 2970 (the "Underwriters") are underwriters composed of separate syndicates, in turn comprised of entities known as "Names," which underwrite insurance in a market known as Lloyd's of London. The "Names" and syndicates are organized under the laws of the United Kingdom, and are located in and have their principal place of business in England. For the period March 8, 2020 to March 8, 2021, the Underwriters issued to RHA and its members Policy Nos. PG2002147, PG2002992, PG2002216, PG2002189, PG2002190, PG2002231, PG2002219, PG2002957, PG2002119, PG2002995, PG2002229, and 2970.

34.     Defendant Hamilton Re, Ltd. ("Hamilton Re") is organized under the laws of Bermuda, with its principal place of business in Bermuda. For the period March 8, 2020 to March 8, 2021, Hamilton Re issued to RHA and its members Policy No. PG2002237.

35.     Defendant National Indemnity Company ("National Indemnity") is organized under the laws of Nebraska, with its principal place of business in Omaha, Nebraska. For the period March 8, 2020 to March 8, 2021, National Indemnity issued to RHA and its members Policy No. DF00000361.

36.     Defendant Axis Surplus Lines Insurance Company ("Axis") is organized under the laws of Illinois, with its principal place of business in Chicago, Illinois and additional corporate offices in Alpharetta, Georgia. For the period March 8, 2020 to March 8, 2021, Axis issued to RHA and its members Policy No. EAF644920-20.

37.     Defendant Columbia Casualty Company ("Columbia Casualty") is organized under the laws of Illinois, with its principal place of business in Chicago, Illinois. For the period March 8, 2020 to March 8, 2021, Columbia Casualty issued to RHA and its members Policy No. 6073241135.

38.     Defendant HDI Global Insurance Company ("HDI") is organized under the laws of Illinois, with its principal place of business in Chicago, Illinois. For the period March 8, 2020 to March 8, 2021, HDI issued to RHA and its members Policy Nos. CPXD5557601 and CPXD5557701.

39.     Defendant SCOR UK Company Limited ("SCOR UK") is organized under the laws of the United Kingdom, with its principal place of business in London, England. For the period March 8, 2020 to March 8, 2021, SCOR UK issued to RHA and its members Policy No. PG2002192.

40.     Defendant Great Lakes Insurance SE ("Great Lakes") is organized under the laws of Germany, with its principal place of business in Munich, Germany. For the period March 8, 2020 to March 8, 2021, Great Lakes issued to RHA and its members Policy No. PG2002191.

41.     Defendant Chubb Bermuda Insurance Ltd. ("Chubb Bermuda") is organized under the laws of Bermuda, with its principal place of business in Bermuda. For the period March 8, 2020 to March 8, 2021, Chubb Bermuda issued to RHA and its members Policy Nos. RHA014500P05 and PRP 238211 - 005.83310.

42.     Defendant Houston Casualty Company ("HCC") is organized under the laws of Texas, with its principal place of business in Houston, Texas. For the period March 8, 2020 to March 8, 2021, HCC issued to RHA and its members Policy No. PG2002114.

43.     Defendant Markel Bermuda Limited ("Markel Bermuda") is organized under the laws of Bermuda, with its principal place of business in Bermuda. For the period March 8, 2020 to March 8, 2021, Markel Bermuda issued to RHA and its members Policy No. PG2002244.

44.     Defendant Evanston Insurance Company ("Evanston") is organized under the laws of Illinois, with its principal place of business in Rosemont, Illinois. For the period March 8, 2020 to March 8, 2021, Evanston issued to RHA and its members Policy No. MKLV10XP003860.

45.     Defendant PartnerRe Ireland Insurance Limited ("PartnerRe Ireland") is organized under the laws of Ireland, with its principal place of business in Dublin, Ireland. For the period March 8, 2020 to March 8, 2021, PartnerRe Ireland issued to RHA and its members Policy No. PG2002115.

46.     Defendant Fidelis Underwriting Limited ("Fidelis") is organized under the laws of the United Kingdom, with its principal place of business in London, England. For the period March 8, 2020 to March 8, 2021, Fidelis issued to RHA and its members Policy No. PG2002969.

47.     At all times material hereto, all Defendants conducted and transacted business through the selling and issuing of insurance policies within Virginia, including, but not limited to, selling and issuing property coverage to RHA and its members.

## IV.     **FACTUAL BACKGROUND**

### A.     *The Insurance Policy*

48.     In return for the payment of a substantial premium, each Defendant sold to RHA and its members a commercial property policy for the period of March 8, 2020, through March 8, 2021, under which Plaintiff is an Insured. The Insureds have performed all of the obligations to Defendants, including payment of premiums. The Covered Property, with respect to Plaintiff, is Winvian Farm, located at 155-156 Alain White Road, Morris, Connecticut 06763.

49.     In many parts of the world, property insurance is sold on a specific peril basis. Such policies cover a risk of loss if that risk of loss is specifically listed (*e.g.*, hurricane, earthquake, H1N1, etc.). Most property policies sold in the United States, however, including those sold by Defendants, are all-risk property damage policies. These types of policies cover all risks of loss except for risks that are expressly and specifically excluded.

50.     Under the heading "Perils Insured Against," the Defendants agreed to cover against, and to pay for, "all risks of direct physical loss of or damage to Covered Property," except as excluded.

51.     Losses due to COVID-19 are "Perils Insured Against" under the Policy.

52.     In the Policy, Defendants agreed to pay for Business Interruption losses "due to the necessary interruption of business conducted by the Insured … resulting from direct physical loss or damage" to Covered Property, during the Period of Restoration. Defendants did not define "interruption" in the Policy, but that term reasonably means to Plaintiff a partial or complete slowdown or cessation of some or all of the busines activities, services, and offerings of the Insured at Covered Property.

53.     Business Interruption losses are "net profit that is prevented from being earned" and "charges and other expenses" that "necessarily continue during the interruption of the business."

54.     The Period of Restoration is "the length of time for which loss may be claimed." The Period of Restoration begins with the date of loss or damage, and continues until property has been rebuilt, repaired, or replaced, or until the Insured has restored its business "to the condition that would have existed had no loss occurred." The Period of Restoration is not limited by the expiration date of the Policy. Due consideration shall also be given to the "level of business operations that would reasonably have been achieved … had no loss or damage" occurred to delay the opening of "alterations, additions, or property" under "construction, erection, installation, or assembly."

55.     Because the existence and spread of COVID-19 has caused the Covered Property to become unsafe for its intended purpose, the Covered Property has thus suffered direct physical loss or damage. The Covered Property's business functions have been impaired. If business were conducted as usual, the disease and virus would show up and people would get sick. This is not a non-physical or remote loss such as one occasioned by a breach of contract, loss of a market, or the imposition of a governmental penalty. It is a direct physical loss.

56.     In addition, the presence of virus or disease constitutes direct physical loss or damage to property, as the insurance industry has recognized since at least 2006. It is present wherever people congregate unless and until precautions are taken that impair the functions of insured property, like the Covered Property in this case. When preparing so-called "virus" exclusions to be placed in some policies, but not others, the insurance industry drafting arm, ISO, circulated a statement to state insurance regulators that included the following:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. … Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case. [10]

57.     The presence of virus or disease has resulted in physical damage to property in that manner in this case, including structural alteration of the ambient air and the surfaces of the property, along with a loss of functionality and the diminishment of functional space.

58.     As described below, due to the presence of COVID-19, Covered Property suffered physical loss or damage. Due to COVID-19, Covered Property also became unsafe for its intended purpose and thus suffered physical loss or damage for that reason as well. The business functions of Covered Property were impaired as a result. If Winvian continued to conduct business as usual,

---

[10] ISO Circular LI-CF-2006-175 (July 6, 2006), at 5-6, 9-10.

the virus would manifest, and guests, employees, and other visitors to Covered Property would risk infection and serious illness or death. This is not a non-physical or remote loss such as one occasioned by a breach of contract, loss of a market, or the imposition of a governmental penalty. Instead, it is a direct physical loss because of the changed physical environment. In its current condition, Plaintiff's Covered Property is functional for its business purposes.

59.     Defendants also agreed to pay reasonable and necessary Extra Expense that Insureds incur during the Period of Restoration that they would not have incurred if no loss or damage occurred. Extra Expense includes costs over and above normal costs to conduct the business. "As soon as practicable, the Insured shall resume normal operations of the business and shall dispense with such Extra Expense."

60.     Defendants also agreed to pay for an Insured's loss of Rental Income during the Period of Restoration caused by direct physical loss or damage to "Covered Property rented, leased or occupied by the Insured and/or rented or leased by the Insured to others." Rental Income means "the total anticipated gross rental income from tenant(s) of the Insured's building(s) and structure(s); … the fair rental reasonably expected from unrented portions of such property and the fair rental for that portion occupied by the Insured."

61.     Defendants also agreed to provide Contingent Business Interruption coverage when direct physical loss of or damage to specified property causes an Insured to suffer a loss, or to suffer Business Interruption, Extra Expense, Rental Income, or Expense to Reduce Loss losses.

62.     Contingent Business Interruption coverage includes losses due to "loss or damage to real and personal property at Attraction Properties not owned or operated by the Insured, located in the same vicinity as the Covered Property and which attracts business to that vicinity" ("Attraction Properties").

63.     Contingent Business Interruption coverage also includes losses due to direct physical loss of or damage to property "occurring within 5 miles of Insured's location, where access to the Insured's real or personal property is prevented by order of civil or military authority" ("Civil Authority"). Civil Authority coverage applies "irrespective of whether the property of the

13

Insured shall have been damaged." Relevant definitions of "prevent" include to "hinder," which means "to make slow or difficult."[11]

64.     Contingent Business Interruption coverage also includes losses due to "the cost to the Insured for goodwill expenditures made by the Insured to temporarily relocate hotel guests in other local facilities following a covered loss at an insured location" ("Guest Relocation Expenses"). Guest Relocation Expenses "shall be payable whether or not guests are relocated to other properties owned, managed, and/or operated by the Insured or subsidiary or affiliated companies or corporations."

65.     Defendants also agreed to cover losses incurred when there is "actual or imminent physical loss or damage" and the Insured takes "reasonable and necessary actions for the temporary protection and preservation of property" ("Protection and Preservation of Property"). By its express terms, Protection and Preservation of Property coverage is not limited to actual direct physical loss or damage to property; instead, Protection and Preservation of Property coverage also applies to imminent loss or damage.

66.     Defendants also agreed to "cover expenses as are necessarily incurred" to reduce any loss under the Policy ("Expense to Reduce Loss"), not to exceed the amount of the reduction of loss.

67.     Losses caused by COVID-19 and the related orders issued by local and state authorities triggered, at minimum, coverages for Business Interruption, Extra Expense, Rental Income, Attraction Properties, Civil Authority, and Guest Relocation Expenses. Plaintiff and other Class Members also incurred losses for Protection and Preservation of Property, and Expense to Reduce Loss.

---

[11] https://www.merriam-webster.com/dictionary/prevent and
https://www.merriam-webster.com/dictionary/hinder

B.      *The Risk Insured Against In the All Risk Policy*

    1.      **The COVID-19 Pandemic**

    68.      The coronavirus and coronavirus-containing respiratory droplets and nuclei are physical substances that are active on physical surfaces and are also emitted into the air. Such substances are not theoretical, intangible, or incorporeal, but rather have a material existence and are physically dangerous. Fomites, droplets, droplet nuclei, and aerosols containing the coronavirus are dangerous physical substances that have a tangible existence.

    69.      Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) is a betacoronavirus that is genetically related to several other zoonotic coronaviruses, including SARS-CoV-1, the etiological agent of SARS. SARS-CoV-2 causes coronavirus disease 2019 (COVID-19) in humans. SARS-CoV-2 has glycoprotein "spikes" that are able to bind to human angiotensin converting enzyme 2 (ACE-2) receptors, which is present on human respiratory epithelial cells. After binding to ACE-2, the virus is able to enter the cells and make copies of itself, which are then released. These released infectious viral particles are then expelled in respiratory secretions as respiratory droplets into a multiphase, turbulent gas cloud during breathing, coughing, sneezing, talking, and singing. There are large and small respiratory droplets within the cloud. Large respiratory droplets can infect other people either directly, through direct contact with respiratory mucosal surfaces, or indirectly, by contaminating surfaces which are then touched by another person who subsequently touches her or his mouth, nose, or eyes. The small droplets remain in the air as an aerosol, which can remain suspended in the air for hours, travel prolonged distances indoors along air currents induced by the heating and ventilation ("HVAC") system, and travel from room to room, infecting people directly through contact with, and inhalation of, the aerosol. Particles from the aerosol can also contaminate surfaces.

    70.      According to the World Health Organization ("WHO"), the incubation period for COVID-19—*i.e.*, the time between exposure to the coronavirus and symptom onset—can be up to 14 days. Other studies suggest that the period may be up to 21 days. Before infected individuals exhibit symptoms, *i.e.*, the so-called "pre-symptomatic" period, they are most contagious, as their

viral loads will likely be very high, and they may not know they have become carriers. In addition, studies from the CDC and others estimate that between 40% to 70% of infected individuals may never become symptomatic (referred to as "asymptomatic" carriers). Pre- and asymptomatic carriers are likely unaware that they are spreading the coronavirus by merely touching objects and surfaces, or by expelling droplets into the air. The National Academy of Sciences has found that the majority of transmission is attributable to people who are not showing symptoms, either because they are pre-symptomatic or asymptomatic.

71.     The virus cannot be observed by the human eye without enhancement. No one can see the virus in the air, on one's hands, or on a surface. This, of course, makes it difficult to eliminate the virus, or eradicate its transmission, from air or surfaces. The presence of the virus is only observed through the infection rate in a particular area.

72.     The presence of the virus in a community, evidenced by infection rates, makes it more probably true than not, that live virus has been transferred in the air and to objects and surfaces. SARS-Co-V-2 spread is logarithmic.

73.     Aerosol, droplet, and fomite transmission are the basis for social distancing, hand-washing, stay-at-home orders, home-shelter orders, distance learning, reduced capacity and/or occupancy limits, and other measures implemented in various executive orders, including the Closure Orders from the State of Connecticut. The virus is physically present in the community, including in the air and on objects and surfaces. Aerosol and fomite transmission are real, and due to constant recontamination of air and surface areas, it is simply impossible to entirely eradicate the virus from indoor spaces and such surfaces if there continue to be unmasked people in the area.

74.     COVID-19 causes physical loss and damage by, among other things, destroying, distorting, corrupting, attaching to, and physically altering property, including its surfaces, and by rendering property unusable, uninhabitable, unfit for intended function, dangerous and unsafe. COVID-19 has caused such physical loss and damage to Plaintiff's property, as described further below.

75.     *First*, respiratory droplets (*i.e.*, droplets larger than 5-10 μm) expelled from infected individuals land on, attach, and adhere to surfaces and objects. In doing so, they structurally change the property and its surface by becoming a part of that surface. This structural alteration makes physical contact with those previously safe, inert surfaces (e.g., fixtures, handrails, furniture) unsafe.

76.     According to the WHO, people can become infected with the coronavirus by touching such objects and surfaces, then touching their eyes, nose, or mouth. This mode of transmission—indirect transmission via objects and surfaces—is known as "fomite transmission." As the WHO has noted, fomite transmission is "a likely mode of transmission for SARS-CoV-2" because studies have consistently confirmed the existence of virus-laden droplets on objects and surfaces "in the vicinity of infected cases," and because it is well known that other coronaviruses can be transmitted via fomite transmission.[12]

77.     A study of a COVID-19 outbreak published in the CDC's Emerging Infectious Diseases journal identified indirect transmission via objects such as elevator buttons and restroom taps as an important possible cause of a "rapid spread" of the coronavirus in a shopping mall in Wenzhou, China.[13]

78.     Research has indicated that the coronavirus can be detected on certain surfaces even weeks after infected persons are present at a given location.

79.     In a study by the U.S. National Institutes of Health, researchers found that the coronavirus was detectable for up to three hours in aerosols, four hours on copper, up to 24 hours on cardboard, and up to three days on stainless steel and plastic surfaces.[14]

80.     Another study found that the coronavirus remains active and dangerous on plastics for at least three days, while another reported that the coronavirus remained stable and viable for

---

[12] *See* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions

[13] *See* https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article

[14] *See* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hourssurfaces

17

seven days on a range of common surfaces, including stainless steel, plastic, glass, and wood.[15] Another study even detected viable coronavirus samples on stainless steel and glass for approximately one month if left at or around room temperature. All of these materials are used at Winvian.

81.   Moreover, in a Risk Topics alert, Defendant Zurich warned its policyholders worldwide about the dangers of COVID-19 at their properties. "Workers can be infected by contacting contaminated surfaces or objects and then touching their eyes, nose or mouth."[16]  Citing a study published by the New England Journal of Medicine, Zurich explained in its Risk Topics alert that COVID-19 can remain in the air up to 3 hours, and has the following surface times:

- On copper: Up to 4 hours
- On cardboard: Up to 24 hours
- On plastic: 2 to 3 days
- On stainless steel: 2 to 3 days.[17]

82.   When the coronavirus and COVID-19 attach to and adhere on surfaces and materials, they become a part of those surfaces and materials, converting the surfaces and materials to fomites.[18] This represents a physical change in the affected surface or material, which constitutes physical loss and damage.

83.   Merely cleaning surfaces may reduce but does not altogether eliminate the risk of transmission amongst people. There may be surfaces with residual infectious virus, and aerosolized infectious particles. In other words, disinfection is temporary at best; however, a space may remain contaminated if an aerosol is present, and immediately become contaminated

---

[15] *See* https://www.nejm.org/doi/full/10.1056/nejmc2004973;
https://www.medrxiv.org/content/10.1101/2020.05.07.20094805v1.full.pdf;
https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7

[16] Zurich, Risk Topics, Disinfecting Offices and Facilities During the COVID-19 Crisis (May 2020), https://www.zurichna.com/-/media/project/zwp/zna/docs/riskeng/covid/zurich-risk-topic-cleaning-and-disinfecting-during-covid-19-outbreak.pdf?la=en&hash=F0638733CD4D60108E821C13AEFEC325.

[17] *Id*.

[18] *See* https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions

thereafter if another infected person is present in the area. This contamination will provide a constant modality for infection to people.

84.    **Second**, when individuals carrying the coronavirus breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei (*i.e.*, those smaller than 5 μm) that remain in the air and, like dangerous fumes, make the premises unsafe and affirmatively dangerous. This process alters the structural properties of air in buildings from safe and breathable to unsafe and dangerous.

85.    Aerosol transmission is believed to be a common mode of transmission in many settings. Aerosols can be generated through simple breathing, as well as heavier breathing while, for example, exercising at a health club. According to research published in The Journal of the American Medical Association, a person who sneezes can release a cloud of pathogen-bearing droplets that can span as far as 23 to 27 feet.[19] If a person is infected with SARS-CoV-2, whether symptomatic or asymptomatic, infectious viral particles will be aerosolized into the air through their breathing. Infection clusters suggest that aerosol, droplet, and fomite transmission explain SARS-CoV-2 transmission amongst humans.

86.    Airborne viral particles are known to have spread into a building's HVAC system, leading to transmission of the coronavirus from person to person. One study found the presence of the coronavirus within the HVAC system servicing hospital ward rooms of COVID-19 patients. This study detected SARS-CoV-2 RNA in ceiling vent openings, vent exhaust filters, and central ducts that were located more than 50 meters from the patients' rooms.[20]

87.    The Environmental Protection Agency ("EPA") has compiled several studies reflecting "epidemiological evidence suggestive of [coronavirus] transmission through aerosol."[21] Based on these and other studies, the EPA has recommended that buildings make improvements to their HVAC systems by, for example, increasing ventilation with outdoor air and air filtration.[22]

[19] *See* https://jamanetwork.com/journals/jama/fullarticle/2763852.

[20] *See* https://www.researchsquare.com/article/rs-34643/v1

[21] *See* https://www.epa.gov/coronavirus/indoor-air-and-covid-19-key-references-andpublications

[22] *See* https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19

88.     The presence of COVID-19 at a property causes physical loss and damage by necessitating remedial measures to reduce or eliminate the presence of cases of COVID-19 and the coronavirus on-site.

89.     The presence of the virus, whether circulating or stagnant, has changed the object, surface, or premises, in that it has become dangerous to handle and/or enter, and cannot be used without remedial measures. Its use can only be restored with remedial action and sufficient time for the contaminated air to be evacuated, as suggested by infectious disease experts.

90.     The presence of cases of COVID-19 at a property causes physical loss and damage by rendering a property that is usable and safe for humans into a property that, absent remedial measures, is unsatisfactory for use, uninhabitable, unfit for its intended function, and extremely dangerous and potentially deadly for humans.

91.     In addition, the presence of COVID-19 on property creates the imminent threat of further damage to that property or to nearby property. Individuals who come into contact, for example, with respiratory droplets at one location in the building by touching a fixture, pressing an elevator button, or gripping a handrail, will carry those droplets on their hands and deposit them elsewhere in the building, causing additional damage and loss.

92.     The presence of COVID-19 has caused civil authorities throughout the country to issue orders requiring the whole or partial interruption of business at a wide range of establishments, including civil authorities with jurisdiction over the Covered Locations. These Closure Orders have directly impacted Plaintiff's businesses.

93.     Many governmental bodies specifically found that COVID-19 causes property damage when issuing stay at home orders. *See* N.Y.C. Emergency Exec. Order No. 100, at 2 (Mar. 16, 2020)[23] (emphasizing the virulence of COVID-19 and that it "physically is causing property loss and damage"); N.Y.C. Emergency Exec. Order No. 103 at 1 (March 25, 2020)[24] (recognizing

---

[23] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf

[24] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-103.pdf

that actions taken to prevent spread of COVID-19 "have led to property loss and damage"); Broward Cty. Fla. Administrator's Emergency Order No. 20-01, at 2 (Mar. 22, 2020)[25] (noting that COVID-19 "constitutes a clear and present threat to the lives, health, welfare, and safety of the people of Broward County"); Harris Cty. Tex. Office of Homeland Security & Emergency Mgmt., Order of Cty. J. Lina Hidalgo, at 2 (Mar. 24, 2020)[26] (emphasizing that the COVID-19 virus can cause "property loss or damage" due to its contagious nature and transmission through "person-to-person contact, especially in group settings"); Napa Cty. Cal. Health & Human Service Agency, Order of the Napa Cty. Health Officer (Mar. 18, 2020)[27] (issuing restrictions based on evidence of the spread of COVID-19 within the Bay Area and Napa County "and the physical damage to property caused by the virus"); City of Key West Fla. State of Local Emergency Directive 2020-03, at 2 (Mar. 21, 2020)[28] (COVID-19 is "causing property damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Oakland Park Fla. Local Public Emergency Action Directive, at 2 (Mar. 19, 2020)[29] (COVID-19 is "physically causing property damage"); Panama City Fla. Resolution No. 20200318.1 (Mar. 18, 2020)[30] (stating that the resolution is necessary because of COVID-19's propensity to spread person to person and because the "virus physically is causing property damage"); Exec. Order of the Hillsborough Cty. Fla. Emergency Policy Group, at 2 (Mar. 27, 2020)[31] (in addition to COVID-19's creation of a "dangerous physical condition," it also creates "property or business income loss and damage in certain circumstances"); Colorado Dep't of Pub. Health & Env't, Updated Public Health Order No. 20-

---

[25] https://www.broward.org/CoronaVirus/Documents/BerthaHenryExecutiveOrder20-01.pdf

[26] https://www.taa.org/wp-content/uploads/2020/03/03-24-20-Stay-Home-Work-Safe-Order_Harris-County.pdf

[27] https://www.countyofnapa.org/DocumentCenter/View/16687/3-18-2020-Shelter-at-Home-Order

[28] https://www.cityofkeywest-fl.gov/egov/documents/1584822002_20507.pdf

[29] https://oaklandparkfl.gov/DocumentCenter/View/8408/Local-Public-Emergency-Action-Directive-19-March-2020-PDF

[30] https://www.pcgov.org/AgendaCenter/ViewFile/Item/5711?fileID=16604

[31] https://www.hillsboroughcounty.org/library/hillsborough/mediacenter/documents/administrator/epg/saferathomeorder.pdf

24, at 1 (Mar. 26, 2020)[32] (emphasizing the danger of "property loss, contamination, and damage" due to COVID-19's "propensity to attach to surfaces for prolonged periods of time"); Sixth Supp. to San Francisco Mayoral Proclamation Declaring the Existence of a Local Emergency, 26 (Mar. 27, 2020)[33] ("This order and the previous orders issued during this emergency have all been issued … also because the virus physically is causing property loss or damage due to its proclivity to attach to surfaces for prolonged periods of time"); City of Durham NC, Second Amendment to Declaration of State of Emergency, at 8 (effective Mar. 26, 2020)[34] (prohibiting entities that provide food services from allowing food to be eaten at the site where it is provided "due to the virus's propensity to physically impact surfaces and personal property"); and State of Nevada Declaration of Emergency Directive 016 at 1 (Apr. 29, 2020)[35]  (noting "ability of the novel coronavirus that causes COVID-19 to survive on surfaces for indeterminate periods of time renders some property unusable and contributes to contamination, damage, and property loss").

### 2.   The Closure Orders in Connecticut

94.   On March 10, 2020, Governor Ned Lamont of the State of Connecticut ordered a Declaration of Public Health and Civil Preparedness Emergencies.[36]

95.   On March 16, 2020, Governor Lamont issued Executive Order No. 7D, which prohibited gatherings of 50 or more people, closed restaurants and bars for all on-premise consumption, and closed "any indoor gym, fitness center, or similar facility or studio offering in-person fitness, sporting or recreational opportunities or instructions."

96.   On March 19, 2020, Governor Lamont issued Executive Order 7G, which prohibited many services offered at spas.

---

[32] https://www.pueblo.us/DocumentCenter/View/26395/Updated-Public-Health-Order---032620

[33] https://sfgov.org/sunshine/sites/default/files/sotf_061020_item3.pdf

[34] https://durhamnc.gov/DocumentCenter/View/30043/City-of-Durham-Mayor-Emergency-Dec-Second-Amdmt-3-25-20_FINAL

[35] https://gov.nv.gov/News/Emergency_Orders/2020/2020-04-29_-_COVID-19_Declaration_of_Emergency_Directive_016_(Attachments)/

[36] The Connecticut Closure Orders are available at https://portal.ct.gov/Coronavirus/Pages/Emergency-Orders-issued-by-the-Governor-and-State-Agencies

97.     On March 20, 2020, Governor Lamont issued Executive Order No. 7H, a "Stay Safe, Stay Home" Order, which restricted workplaces for non-essential businesses.

98.     On March 26, 2020, Governor Lamont issued Executive Order No. 7N, which prohibited gatherings of 6 or more people.

99.     On April 2, 2020, Governor Lamont issued Executive Order No. 7T, which closed hotels, resorts, and other commercial overnight accommodation for non-essential lodging. "Accordingly, the provision and occupancy of lodging for leisure, vacation, and other purposes may not continue."

100.    On April 10, 2020, Governor Lamont issued Executive Order No. 7X, including "Extension of Closures, Distancing, and Safety Measures Through May 20, 2020."

101.    On June 16, 2020, Governor Lamont issued Executive Order No. 7ZZ, which lifted the lodging, indoor dining, fitness facility, and spa service closures, subject to compliance with social distancing and other COVID-19 rules.

102.    On June 24, 2020, Governor Lamont issued Executive Order No. 7BBB, which ordered a travel advisory requiring a 14-day self-quarantine for travelers entering Connecticut from certain other states.

103.    On July 21, 2020, Governor Lamont issued Executive Order No. 7III, which repealed the prior "Advisory Self-Quarantine," and imposed a "Mandatory Self-Quarantine for Travelers" from certain states, for a 14-day self-quarantine period.

104.    On September 1, 2020, Governor Lamont extended the Declaration of Public Health and Civil Preparedness Emergencies until February 9, 2021.

105.    On November 5, 2020, Governor Lamont issued Executive Order No. 9K, which authorized rules for mandatory closing times for certain businesses.

106.    On February 4, 2021, Governor Lamont issued Executive Order No. 10, which permitted indoor religious gatherings at 50% occupancy, with social distancing and other COVID-19 rules.

107.     On February 8, 2021, Governor Lamont issued Executive Order 10A, which extended "unexpired and currently effective executive orders and individual section of executive orders" through April 19, 2021.

108.     The Closure Orders were issued in response to the presence of COVID-19 in Connecticut and around the United States.

109.     The State of Connecticut Department of Public Health, pursuant to its authority under Connecticut law, has issued directives and guidance related to COVID-19 commencing on March 16, 2020 and continuing to the present time.

110.     The State of Connecticut is a civil authority for Civil Authority coverage in the Policy.

### 3.     Closure Orders Throughout the United States and Mexico

111.     There has been sustained transmission of COVID-19 on six continents. The United States has reported the most cases and deaths, with cases in all 50 states. At present, Mexico falls at Number 13 on the list of cases, but at Number 3 on the list of deaths.

112.     Closure Orders were also issued by local, state, provincial or national jurisdictions of Class Members throughout the United States and the world. A non-comprehensive list, for illustration, includes the following states and countries where Class Members have Covered Properties:

- Arizona, California, Colorado, Florida, Georgia, Hawaii, Illinois, Indiana, Maine, Massachusetts, New Hampshire, New Jersey, New Mexico, New York, Pennsylvania, South Carolina, Texas, Vermont, Virginia, Washington, and Wisconsin.

- Mexico.

### 4.     The Impact of COVID-19 and the Closure Orders

113.     Winvian has suffered direct physical loss or damage for the reasons stated above, and as follows.

24

114.    The first known cases of COVID-19 appeared in Litchfield County, where Winvian is located, by March 12, 2020.[37] The seven-day average for new known cases is as follows:

| | |
|---|---|
| April 1, 2020 | 14.0 |
| May 1, 2020 | 29.4 |
| June 1, 2020 | 7.7 |
| (New cases continued, at a lower rate) | |
| November 1, 2020 | 27.0 |
| December 1, 2020 | 91.3 |
| January 1, 2021 | 67.4 |
| February 1, 2021 | 63.0 |
| March 1, 2021 | 41.0 |

115.    The Torrington Area Health District, which includes Morris, where Winvian is located, has reported COVID-19 cases in Morris, Litchfield, and other towns throughout the Health District.[38]

116.    As of February 8, 2021, the people of Litchfield County experienced known 11,293 COVID-19 cases, leading to 281 deaths.[39] Morris has experienced 110 known cases, leading to two deaths, and Litchfield has experienced 355 known cases, leading to eight deaths.[40]

117.    The coronavirus is ubiquitous—it has spread throughout Litchfield County, Connecticut, and all fifty states. Some individuals carry it with no symptoms, it cannot be visibly detected on surfaces and can remain on surfaces for weeks. The prolonged presence of COVID-19 in the areas encompassing Winvian made it unavoidable that individuals with COVID-19 or otherwise carrying the coronavirus, including guests, employees, contractors, and business visitors, would be physically present at the resort on various dates since the earliest days of the pandemic. Guests reported COVID-19 positive test results to Winvian in conjunction with their stays, and employees have had to quarantine due to direct exposure

---

[37] https://covidactnow.org/us/connecticut-ct/county/litchfield_county/?s=1648587

[38] https://www.tahd.org/weekly-updates-for-covid-19-positivity-rates-within-the-torrington-area-health-district-tahd-jurisdiction.html

[39] https://www.nytimes.com/interactive/2020/us/connecticut-coronavirus-cases.html#county

[40] https://covid.yale.edu/innovation/mapping/case-maps/connecticut-dashboard/

118.    Coronavirus-containing fomites (*i.e.*, inanimate objects), respiratory droplets, and nuclei from those individuals come into contact with, adhere to, and attach to the surfaces of the property upon which they land, including without limitation, the real property, furniture, fixtures, and personal property at the properties.

119.    Coronavirus or coronavirus-containing fomites, respiratory droplets, and nuclei physically alter property to which they adhere, attach, or come in contact including without limitation by altering the surfaces of that property and/or by making physical contact with those previously safe, inert materials dangerous.

120.    When individuals carrying the coronavirus breathe, talk, cough, or sneeze, they expel aerosolized droplet nuclei that remain in the air and, like dangerous fumes, make the premises unsafe and affirmatively dangerous. In addition, the coronavirus physically alters the air. Air inside buildings that was previously safe to breathe but can no longer safely be breathed due to coronavirus and COVID-19, has undergone a physical alteration.

121.    Coronavirus droplets have been conveyed from infected persons (whether symptomatic, pre-symptomatic, or asymptomatic) to solid surfaces, including but not limited to furniture, doors, floors, bathroom facilities, equipment, and supplies, and into the air and HVAC system at Winvian, causing damage and alteration to physical property and ambient air at the premises. Aerosolized coronavirus has entered the air in Plaintiff's properties.

122.    The presence of the coronavirus and COVID-19, including but not limited to coronavirus droplets or nuclei on solid surfaces and in the air at insured property, has caused and will continue to cause direct physical damage to physical property and ambient air at the premises. Coronavirus, a physical substance, has attached and adhered to Plaintiff's properties, and by doing so, altered that property. Such presence has also directly resulted in loss of functionality of that property.

123.    The presence of COVID-19 caused direct physical loss or damage to the Covered Property under the Policy and caused a necessary interruption of business during a period of liability.

124.     The physical losses to Plaintiff's property include without limitation the rendering of the property from a satisfactory state to a state dangerous and/or unsatisfactory for use because of the fortuitous presence and effect of the coronavirus, fomites, and respiratory droplets or nuclei directly upon the property.

125.     The physical losses to Plaintiff's properties include without limitation the physical loss of the ability to use Covered Property for its primary function.

126.     The presence of COVID-19 caused direct physical loss or damage to the Covered Property of Plaintiff and other Class Members, by (i) causing direct physical loss of or damage to the Covered Property; (ii) denying use of and damaging the Covered Property; (iii) requiring physical repair and/or alterations to the Covered Property; and/or (iv) by causing a necessary interruption of operations during a period of restoration.

127.     Because of the spread or presence of COVID-19, the air in the buildings at Winvian has become unsafe.

128.     In addition, the functional space at Winvian has been diminished and lost by the spread or presence of COVID-19. For example, the lodging, pool house, spa, fitness, restaurant, tavern, bar, indoor wedding and reception, meeting, retreat, and event spaces at Winvian lost their normal functionality and the spaces could not be used for at least several months, and have also been capacity-limited.

129.     Closures at Winvian include that Winvian closed for lodging, restaurant, and spa services on March 17, 2020, and partially reopened with capacity limits, reduced offerings at the spa, and other COVID-19 measures on June 21, 2021. In addition, the restaurant offered limited takeout service three days per week beginning on May 7, 2020. Winvian resumed massages and facials at the spa on July 8, 2020 and September 19, 2020, respectively, with capacity limits and other COVID-19 measures.

130.     To repair the physical loss or damage, including the harm to the air inside Covered Property and the infestation on the surface of Covered Property caused by COVID-19, Winvian took several further measures, including: managing guest rooms to allow maximum time between

27

guest stays; installing hand sanitizer stations throughout the resort; closing guest laundry and valet services; capacity-limited and spaced pool-side seating; closing pool-side food service; closing the showers at the pool house; closing the showers at the spa; closing the spa to outside guests; capacity-limited spa use; reconfiguring the spa space; capacity-limited gym use; capacity-limited dining rooms; reducing the number of dining tables; capacity-limited dining groups to tables of eight; closing the dining rooms, tavern, and bar after 10:00 p.m.; closing cooking classes; and closing food stations and buffets. In addition, Winvian installed nine Plexiglass dividers in the bar, spa, and office, installed ionizing air filtration devices in public areas, and built a screened in dining area.

131. Thus, because the spread and presence of COVID-19 altered the structure of the air, the physical space, and property surfaces, there have been many even more obvious structural alterations, changes and/or repairs made at the resort so that Winvian can continue its business after experiencing direct property damage which was caused by COVID-19 and to avoid imminent threat of further property damage.

132. The Closure Orders prohibited access to Covered Property, and the area immediately surrounding Covered Property, in response to dangerous physical conditions resulting from a risk insured against in the all risk Policy.

133. Property within five miles and three miles of Winvian suffered direct physical loss of or damage as described above, and in the same manner that Winvian suffered such loss or damage as described above.

134. Due to COVID-19 and the Closure Orders, Litchfield History Museum, and the Tapping Reeve House and Law School (the first law school in the U.S.), located 4.4 miles from Winvian, closed for 2020, with aspirations to welcome back visitors in Spring 2020.[41] The Law School has attracted visitors from as far away as California and Australia.

---

[41] https://www.litchfieldhistoricalsociety.org/museums/tapping-reeve-house-and-law-school/

135.    Due to COVID-19 and the Closure Orders, the historic Oliver Wolcott Library, located 4.3 miles from Winvian, closed in March 2020. The library reopened on July 15, 2020 under Stage 2 guidelines with a capacity limit of 12 patrons allowed inside the library at the same time, and a ban on allowing "patrons to sit, read, study, work, or engage in any activity that prolongs visits or utilizes shared furniture/spaces."[42]

136.    Due to COVID-19 and the Closure Orders, the Nature Museum at White Memorial Conservation Center, located 2.7 miles from Winvian, closed in March 2020 until further notice.[43] Outdoor spaces at the Conservation Center remained open, but with social distancing and other COVID-19 measures. All buildings were closed until further notice, and all rentals were cancelled until further notice. The Museum and Conservation Center have attracted visitors from throughout the Northeast, and from as far away as London, England.

137.    As a result of the presence of COVID-19 and the Closure Orders, Plaintiff and other Class Members experienced insured losses for Business Interruption, Extra Expense, Rental Income, Attraction Properties, Civil Authority, Guest Relocation Expenses, Protection and Preservation of Property, and Expense to Reduce Loss.

138.    Plaintiff submitted its claim for loss to Defendants under the Policy due to the presence of COVID-19 and the Closure Orders, and Defendants denied the claim.

139.    Defendants' denial of coverage is wrongful. Any alleged requirement of direct physical loss of or damage to property is satisfied by the structural alterations and impairment of the business function of Covered Property. Neither can Defendants meet their burden to show that any exclusions apply.

140.    The "contaminants or pollutants" exclusion (Policy Para. No. 25(g)) is reasonably understood by Plaintiff to apply only to traditional environmental contamination and industrial pollution.

---

[42] https://www.owlibrary.org/owl-updates-news.aspx

[43] https://whitememorialcc.org/special-events/

141.    The "Pollution, Contamination, Debris Removal Exclusion Endorsement," and the "Authorities Exclusion" therein, are reasonably understood by Plaintiff to apply only to traditional environmental contamination and industrial pollution.

142.    The exclusion for wood disease (Policy Para. No. 25(i)) is reasonably understood by Plaintiff to not apply to COVID-19 because, among other reasons, coronavirus damages a long list of wood and non-wood property types but is not wood disease, and the listed examples of causes of wood disease as insects, vermin, bacteria, fungi, virus, mold spores, wet rot, and dry rot do not imply inclusion of viruses that do not cause wood disease.

143.    The "Mold, Mildew & Fungus Clause and Microorganism Exclusion" Endorsement is reasonably understood by Plaintiff to not apply to COVID-19 because, among other reasons, the coronavirus is not a an organism, let alone a microorganism, and the listed examples of microorganisms as mold, mildew or fungus, and spores do not reasonably imply inclusion of viruses.[44]

## V.    CLASS ACTION ALLEGATIONS

144.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated.

145.    Plaintiff seeks to represent a Class defined as all persons and entities with claims for Business Interruption and Contingent Business Interruption under the Policy, including persons and entities that, due to direct physical loss or damage to property resulting from COVID-19 and the Closure Orders:

> (a)    suffered a necessary interruption of business at Covered Property; or

---

[44] The definitions of mold, mildew, fungus, spores, and microorganism do not include "virus." https://www.merriam-webster.com/dictionary.

    (b)    incurred Extra Expense at their business over and above what normally would have been incurred had there been no loss or damage; or

    (c)    lost Rental Income at Covered Property; or

    (d)    sustained business losses due to loss or damage to Attraction Properties in the same vicinity as their Covered Property; or

    (e)    sustained business losses due to order of civil or military authority as a result of direct physical loss or damage to property within five miles of their business; or

    (f)    made goodwill expenditures to temporarily relocate hotel or resort guests following a covered loss to Covered Property; or

    (g)    (i) incurred expenses for the temporary protection and preservation of Covered Property due to actual or imminent physical loss or damage to Covered Property, or (ii) necessarily incurred expenses to reduce any covered loss.

146.    Excluded from the Class are Defendants and any of their members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Court staff assigned to this case and their immediate family members. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

147.    This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

148.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the defined Class are so numerous that individual joinder of all Class Members is impracticable. While Plaintiff is informed and believes that there are thousands of members of the Class, the precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and/or published notice.

149.    **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting only individual Class Members, including, without limitation:

(a)    Defendants issued the Policy in exchange for payment of premiums by, or on behalf of, the Class;

(b)    whether the Class suffered a covered loss;

(c)    whether the Business Interruption, Extra Expense, Rental Income, Attraction Properties, Civil Authority, Guest Relocation Expenses, Protection and Preservation of Property, and Expense to Reduce Loss coverages in the Policy apply to business losses resulting from COVID-19 and the Closure Orders;

(d)    whether Defendants breached their contract of insurance by their denial of claims for Business Interruption, Extra Expense, Rental Income, Attraction Properties, Civil Authority, Guest Relocation Expenses, Protection and Preservation of Property, and Expense to Reduce Loss coverages resulting from COVID-19 and the Closure Orders;

(e)    whether Defendants can show that any exclusions apply to claims for Business Interruption, Extra Expense, Rental Income, Attraction Properties, Civil Authority, Guest Relocation Expenses, Protection and Preservation of Property, and Expense to Reduce Loss coverages resulting from COVID-19 and the Closure Orders;

(f)    whether Plaintiff and the other Class Members are entitled to an award of reasonable attorney fees, interest, and costs.

150.    **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class Members' claims because Plaintiff and the other Class Members are all similarly affected by Defendant's refusal to pay under its Business Interruption, Extra Expense, Rental Income, Attraction Properties, Civil Authority, Guest Relocation Expenses, Protection and Preservation of Property, and Expense to Reduce Loss coverages. Plaintiff's claims are based upon

the same legal theories as those of the other Class Members. Plaintiff and the other Class Members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged.

151. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the other Class Members whom they seek to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds by failing to pay the amounts owed under their policies, and Plaintiff intends to prosecute this action vigorously. The interests of the above-defined Class will be fairly and adequately protected by Plaintiff and their counsel.

152. **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests—Federal Rule of Civil Procedure 23(b)(1).** Plaintiff seeks class-wide adjudication as to the interpretation, and resultant scope, of Defendants' Business Interruption, Extra Expense, Rental Income, Attraction Properties, Civil Authority, Guest Relocation Expenses, Protection and Preservation of Property, and Expense to Reduce Loss coverages. The prosecution of separate actions by individual Class Members would create an immediate risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants. Moreover, the adjudications sought by Plaintiff could, as a practical matter, substantially impair or impede the ability of other Class Members, who are not parties to this action, to protect their interests.

153. **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Defendant acted or refused to act on grounds generally applicable to Plaintiff and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members.

154. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy,

33

and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT -- BUSINESS INTERRUPTION

155.    Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

156.    Plaintiff brings this Count individually and on behalf of the Class.

157.    The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

158.    In the Policy, Defendants agreed to pay for Business Interruption losses "due to the necessary interruption of business conducted by the Insured ... resulting from direct physical loss or damage" to Covered Property, during the Period of Restoration.

159.    A business interruption occurs when there is a partial or complete slowdown or cessation of some or all of the busines activities, services, and offerings of the Insured at Covered Property. The Period of Restoration is "the length of time for which loss may be claimed." The Period of Restoration begins with the date of loss or damage, and continues until property has been rebuilt, repaired, or replaced, or until the Insured has restored its business "to the condition that would have existed had no loss occurred."

160.    Business Interruption losses are "net profit that is prevented from being earned" and "charges and other expenses" that "necessarily continue during the interruption of the business."

161.    COVID-19 and the Closure Orders caused direct physical loss or damage to the Covered Property of Class Members, resulting in interruption of their business. Losses caused by COVID-19 and the Closure Orders thus triggered the Business Interruption provision of the Policy.

162.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

163.    By denying coverage for Business Interruption losses incurred by the Class, Defendants have breached their coverage obligations under the Policy.

164.    As a result of Defendants' breach of the Policy, the Class has sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

**COUNT II**
**BREACH OF CONTRACT – EXTRA EXPENSE**

165.    Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

166.    Plaintiff brings this Count individually and on behalf of the Class.

167.    The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

168.    In the Policy, Defendants agreed to pay reasonable and necessary Extra Expense that Insureds incur during the Period of Restoration that they would not have incurred if no loss or damage occurred.

169.    Extra Expense includes costs over and above normal costs to conduct the business.

170.    Due to COVID-19 and the Closure Orders, Class Members incurred Extra Expense.

171.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

172.    By denying coverage for Extra Expense losses incurred by the Class, Defendants have breached their coverage obligations under the Policy.

173.    As a result of Defendants' breach of the Policy, the Class has sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

## COUNT III
## BREACH OF CONTRACT – RENTAL INCOME

174.   Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

175.   Plaintiff brings this Count individually and on behalf of the Class.

176.   The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

177.   In the Policy, Defendants agreed to pay for loss of Rental Income during the Period of Restoration caused by direct physical loss or damage to "Covered Property rented, leased or occupied by the Insured and/or rented or leased by the Insured to others."

178.   Rental Income means "the total anticipated gross rental income from tenant(s) of the Insured's building(s) and structure(s); … the fair rental reasonably expected from unrented portions of such property and the fair rental for that portion occupied by the Insured."

179.   Due to COVID-19 and the Closure Orders, Class Members incurred lost Rental Income losses.

180.   Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

181.   By denying coverage for Rental Income losses incurred by the Class, Defendants have breached their coverage obligations under the Policy.

182.   As a result of Defendants' breach of the Policy, the Class has sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

## COUNT IV
## BREACH OF CONTRACT – ATTRACTION PROPERTIES

183.   Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

184.   Plaintiff brings this Count individually and on behalf of the Class.

185.   The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

186.     In the Policy, Defendants also agreed to pay losses due to "loss or damage to real and personal property at Attraction Properties not owned or operated by the Insured, located in the same vicinity as the Covered Property and which attracts business to that vicinity."

187.     Due to COVID-19 and the Closure Orders, Class Members incurred Attraction Properties losses.

188.     Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

189.     By denying coverage for Attraction Properties losses incurred by the Class, Defendants have breached their coverage obligations under the Policy.

190.     As a result of Defendants' breach of the Policy, the Class has sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

## COUNT V
## BREACH OF CONTRACT – CIVIL AUTHORITY

191.     Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

192.     Plaintiff brings this Count individually and on behalf of the Class.

193.     The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

194.     In the Policy, Defendants agreed to pay for losses due to direct physical loss of or damage to property "occurring within 5 miles of Insured's location, where access to the Insured's real or personal property is prevented by order of civil or military authority."

195.     Civil Authority coverage applies "irrespective of whether the property of the Insured shall have been damaged."

196.     Property within five miles of Insureds' locations has suffered direct physical loss of or damage as described above, and in the same manner that Insureds' locations have suffered such loss or damage as described above.

37

197.    The Closure Orders triggered the Civil Authority provision of the Policy.

198.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

199.    By denying coverage for Civil Authority losses incurred by the Class, Defendants have breached their coverage obligations under the Policy.

200.    As a result of Defendants' breach of the Policy, the Class has sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

## COUNT VI
### BREACH OF CONTRACT – GUEST RELOCATION EXPENSE

201.    Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

202.    Plaintiff brings this Count individually and on behalf of the Class.

203.    The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

204.    In the Policy, Defendants agreed to pay for losses due to "the cost to the Insured for goodwill expenditures made by the Insured to temporarily relocate hotel guests in other local facilities following a covered loss at an insured location."

205.    Guest Relocation Expenses "shall be payable whether or not guests are relocated to other properties owned, managed, and/or operated by the Insured or subsidiary or affiliated companies or corporations."

206.    Due to COVID-19 and the Closure Orders, Class Members incurred Guest Relocation Expense losses.

207.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

38

208.    By denying coverage for Guest Relocation Expense losses incurred by the Class, Defendants have breached their coverage obligations under the Policy.

209.    As a result of Defendants' breach of the Policy, the Class has sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

## COUNT VII
## BREACH OF CONTRACT – PROTECTION AND PRESERVATION OF PROPERTY, AND EXPENSE TO REDUCE LOSS

210.    Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

211.    Plaintiff brings this Count individually and on behalf of the Class.

212.    The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

213.    In the Policy, Defendants agreed to cover losses incurred when there is "actual or imminent physical loss or damage" and the Insured takes "reasonable and necessary actions for the temporary protection and preservation of property."

214.    By its express terms, Protection and Preservation of Property coverage is not limited to actual direct physical loss or damage to property, but rather also applies to imminent loss or damage.

215.    In the Policy, Defendants also agreed to "cover expenses as are necessarily incurred" to reduce any loss under the Policy, not to exceed the amount of the reduction of loss.

216.    Plaintiff and other Class Members interrupted operations and took other actions that triggered the Protection and Preservation of Property coverage.

217.    Class Members also necessarily incurred expenses to reduce loss under the Policy.

218.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

219.    By denying coverage for Protection and Preservation of Property and Expense to Reduce Loss losses incurred by the Class, Defendants have breached their coverage obligations under the Policy.

220.    As a result of Defendants' breach of the Policy, the Class has sustained substantial damages for which Defendants are liable, in an amount to be established at trial.

## COUNT VIII
### DECLARATORY JUDGMENT – BUSINESS INTERRUPTION

221.    Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

222.    Plaintiff brings this Count individually and on behalf of the Class.

223.    The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

224.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

225.    An actual case or controversy exists regarding Class Members' rights and Defendants' obligations under the Policy to reimburse the full amount of Business Interruption losses incurred by the Class in connection with interruption of their businesses stemming from COVID-19 and the Closure Orders.

226.    Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

    i.    Class Members' Business Interruption losses resulting from COVID-19 and the Closure Orders are insured losses under the Policy; and

    ii.    Defendants are obligated to pay the Class for the full amount of the Business Interruption losses incurred and to be incurred as a result of COVID-19 and the Closure Orders.

40

## COUNT IX
## DECLARATORY JUDGMENT – EXTRA EXPENSE

227.     Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

228.     Plaintiff brings this Count individually and on behalf of the Class.

229.     The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

230.     Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

231.     An actual case or controversy exists regarding Class Members' rights and Defendants' obligations under the Policy to reimburse the full amount of Extra Expense losses incurred by the Class in connection with interruption of their businesses stemming from COVID-19 and the Closure Orders.

232.     Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

      i.      Class Members' Extra Expense losses resulting from COVID-19 and the Closure Orders are insured losses under the Policy; and

      ii.     Defendants are obligated to pay the Class for the full amount of the Extra Expense losses incurred and to be incurred as a result of COVID-19 and the Closure Orders.

## COUNT X
## DECLARATORY JUDGMENT – RENTAL INCOME

233.     Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

234.     Plaintiff brings this Count individually and on behalf of the Class.

235.     The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

236.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

237.    An actual case or controversy exists regarding Class Members' rights and Defendants' obligations under the Policy to reimburse the full amount of Rental Income losses incurred by the Class in connection with interruption of their businesses stemming from COVID-19 and the Closure Orders.

238.    Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

> i.      Class Members' Rental Income losses resulting from COVID-19 and the Closure Orders are insured losses under the Policy; and
>
> ii.     Defendants are obligated to pay the Class for the full amount of the Rental Income losses incurred and to be incurred as a result of COVID-19 and the Closure Orders.

## COUNT XI
## DECLARATORY JUDGMENT – ATTRACTION PROPERTIES

239.    Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

240.    Plaintiff brings this Count individually and on behalf of the Class.

241.    The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

242.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

243.    An actual case or controversy exists regarding Class Members' rights and Defendants' obligations under the Policy to reimburse the full amount of Attraction Properties

losses incurred by the Class in connection with interruption of their businesses stemming from COVID-19 and the Closure Orders.

244.    Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

> i.    Class Members' Attraction Properties losses resulting from COVID-19 and the Closure Orders are insured losses under the Policy; and

> ii.   Defendants are obligated to pay the Class for the full amount of the Attraction Properties losses incurred and to be incurred as a result of COVID-19 and the Closure Orders.

## COUNT XII
## DECLARATORY JUDGMENT – CIVIL AUTHORITY

245.    Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

246.    Plaintiff brings this Count individually and on behalf of the Class.

247.    The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

248.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

249.    An actual case or controversy exists regarding Class Members' rights and Defendants' obligations under the Policy to reimburse the full amount of Civil Authority losses incurred by the Class in connection with interruption of their businesses stemming from COVID-19 and the Closure Orders.

250.    Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

> i.    Class Members' Civil Authority losses resulting from COVID-19 and the Closure Orders are insured losses under the Policy; and

      ii.    Defendants are obligated to pay the Class for the full amount of the Civil Authority losses incurred and to be incurred as a result of COVID-19 and the Closure Orders.

### COUNT XIII
### DECLARATORY JUDGMENT – GUEST RELOCATION

251.    Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

252.    Plaintiff brings this Count individually and on behalf of the Class.

253.    The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

254.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

255.    An actual case or controversy exists regarding Class Members' rights and Defendants' obligations under the Policy to reimburse the full amount of Guest Relocation losses incurred by the Class in connection with interruption of their businesses stemming from COVID-19 and the Closure Orders.

256.    Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

      i.    Class Members' Guest Relocation losses resulting from COVID-19 and the Closure Orders are insured losses under the Policy; and

      ii.    Defendants are obligated to pay the Class for the full amount of the Guest Relocation losses incurred and to be incurred as a result of COVID-19 and the Closure Orders.

### COUNT XIV
### DECLARATORY JUDGMENT – PROTECTION AND PRESERVATION OF PROPERTY, AND EXPENSE TO REDUCE LOSS

257.    Plaintiff repeats and realleges Paragraphs 1-154 as if fully set forth herein.

258.    Plaintiff brings this Count individually and on behalf of the Class.

259.    The Policy is a contract under which Defendants received premiums on behalf of the Class, in exchange for Defendants' promise to pay claims covered by the Policy.

260.    Class Members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Defendants or Defendants are estopped from asserting them, and yet Defendants have denied their insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

261.    An actual case or controversy exists regarding Class Members' rights and Defendants' obligations under the Policy to reimburse the full amount of Protection and Preservation of Property losses and Expense to Reduce Loss losses incurred by the Class stemming from COVID-19 and the Closure Orders.

262.    Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment from this Court declaring the following:

      i.    Class Members' Protection and Preservation of Property losses resulting from COVID-19 and the Closure Orders are insured losses under the Policy; and

      ii.    Class Members' Expense to Reduce Loss losses resulting from COVID-19 and the Closure Orders are insured losses under the Policy; and

      iii.    Defendants are obligated to pay the Class for the full amount of the Protection and Preservation of Property losses, and Expense to Reduce Loss losses, incurred and to be incurred as a result of COVID-19 and the Closure Orders.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all Class Members, respectfully request that the Court enter judgment in its favor and against Defendants as follows:

a.    Entering an order certifying the proposed Class, as requested herein, designating Plaintiff as Class representative, and appointing Plaintiff's undersigned attorneys as Counsel for the Class;

b.      Entering judgment on Counts I-VII in favor of the Class and awarding damages for breach of contract in an amount to be determined at trial;

c.      Entering declaratory judgments on Counts VIII-XIV in favor of the Class, as follows;

i.    Class Members' Business Interruption, Extra Expense, Rental Income, Attraction Properties, Civil Authority, Guest Relocation Expenses, Protection and Preservation of Property, and Expense to Reduce Loss losses stemming from the necessary interruption of their business, COVID-19 and the Closure Orders are insured losses under the Policy; and

ii.   Defendants are obligated to pay for the foregoing losses incurred and to be incurred by the Class.

d.      Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

e.      Ordering Defendants to pay attorneys' fees and costs of suit; and

f.      Ordering such other and further relief as may be just and proper.

## VIII.   JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: March 12, 2021                    Respectfully submitted,

**MICHIE HAMLETT**

By:  /s/  Lisa S. Brook
     Lisa S. Brook (VSB No. 35661)
     E. Kyle McNew (VSB No. 73210)
     310 4th Street NE
     PO Box 298
     Charlottesville, Virginia  22902
     Phone: 434-951-7231
     Fax: 434-951-7254
     lbrook@michiehamlett.com
     kmcnew@michiehamlett.com

Adam J. Levitt*
Amy E. Keller*
Daniel R. Ferri*
Mark Hamill*
Laura E. Reasons*
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
dferri@dicellolevitt.com
mhamill@dicellolevitt.com
lreasons@dicellolevitt.com

Mark A. DiCello*
Kenneth P. Abbarno*
Mark Abramowitz*
**DiCELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio  44060
Telephone:  440-953-8888
madicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

Mark Lanier*
Alex Brown*
Ralph (Skip) McBride*
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas  77064
Telephone:  713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com
skip.mcbride@lanierlawfirm.com

Timothy W. Burns*
Jeff J. Bowen*
Jesse J. Bair*
Freya K. Bowen*
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin  53703
Telephone: 608-286-2302
tburns@bbblawllp.com

47

jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Douglas Daniels*
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas  77057
Telephone:  713-917-0024
douglas.daniels@dtlawyers.com

*Counsel for Plaintiff
and the Proposed Class*

\*Applications for admission *pro hac vice* to be filed